IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| VIOLET RABON, | ) Civil Action No. 4:08-3442-GRA-TER |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

This is an action brought pursuant to Section 205(g) of the Social Security Act (Act), as amended, 42 U.S.C. § 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I. PROCEDURAL HISTORY

The plaintiff filed an application for DIB on June 23, 1998, alleging a disability onset date of April 24, 1998. (Tr. 51-54). Plaintiff requested a hearing before an administrative law judge (ALJ) after her claim was denied initially and on reconsideration. (Tr. 32-40 ). A hearing was held on March 1, 2000, before ALJ Benjamin T. DeBerry, at which plaintiff appeared with her attorney and testified. Plaintiff's husband also testified at the hearing. (Tr. 181-226). The ALJ issued a decision on August 4, 2000, finding that plaintiff was not disabled because she could perform her past relevant work as a sewing machine operator. (Tr. 10-20). After the Appeals Council denied her request for review on

April 17, 2002 (Tr. 6-7), plaintiff filed suit in this Court on May 23, 2002, seeking judicial review of the final decision of the Commissioner. The undersigned issued a Report and Recommendation (R&R) on May 30, 2003, recommending reversal of the Commissioner's decision and remand. On June 25, 2003, this Court adopted the R&R, and reversed and remanded the case to the Commissioner, directing that vocational expert testimony be obtained to determine whether plaintiff could return to her past relevant work as a sewing machine operator, or whether she could perform other light work, and directing that further consideration be given to: reports from Dr. Ronald L. Collins; her alleged asthma and allergies; her complaints of back pain; and her alleged inability to sit for more than twenty minutes at a time. (Tr. 279-296). On September 7, 2005, the Appeals Council vacated the Commissioner's final decision of August 2000 and remanded the case to an ALJ for further proceedings pursuant to this court's order. (Tr. 278). A supplemental administrative hearing was conducted on July 6, 2006 before ALJ Albert A. Reed, at which plaintiff appeared with her attorney and testified. Plaintiff's husband and a vocational expert also testified at the hearing. (Tr. 455-508). The ALJ issued a decision on July 19, 2006, finding that plaintiff was not disabled because she could perform her past relevant work as a sewing machine operator. (Tr. 238-250). The Appeals Council denied plaintiff's request for review on August 14, 2008 (Tr. 228-231), making the ALJ Reed's July 19, 2006 decision the final decision of the Commissioner for purposes of judicial review under 42 U.S.C. § 405(g). See 20 C.F.R. §§ 404.981. Plaintiff filed this action on October 14, 2008.

## II. FACTUAL BACKGROUND

The plaintiff was born May 2, 1949 (Tr. 51). She was 48 years old at the time her disability allegedly began, and was 54 years old on March 31, 2004, the date she last met the insured status requirements of the Act. (Tr. 239, 240). She last worked on April 24, 1998. (Tr. 239, 240). She

testified that she completed the eighth grade and later obtained a general educational development (GED) certificate. (Tr. 186). Plaintiff's past relevant work experience is as a sewing machine operator (from 1987-1990 at ElKay Industries) and clerk/cashier (from 1992-1998 at Sunbeam Bread Store). (Tr. 282). Plaintiff alleges disability due to a combination of impairments: (1) obesity; (2) fibromyalgia causing profound fatigue, impaired energy, disturbed sleep, myalgias, joint pain, and weakness; (3) sleep apnea causing interrupted sleep, non-restorative sleep, significant fatigue with impairments in the basic activities of daily living; (4) depression and anxiety causing crying spells, nervousness in traffic, impaired memory, impaired sleep, moodiness with irritability, not wanting to leave the house often, days where she does not get dressed or bathe; (5) asthma exacerbated by environmental irritants such as perfume, dust, chemicals, cleaners, and cigarette smoke; (6) arthritis of the sacroiliac (SI) joint, right knee, right shoulder, and feet; and (7) frequent bowel and bladder incontinence. (Pl. Br. 3).

### III. DISABILITY ANALYSIS

The plaintiff's arguments consist of the following, quoted verbatim:

1. The ALJ's decision is not supported by substantial evidence.

2. The ALJ erred in failing to find that the claimant's medical conditions of depression, anxiety, asthma and sleep apnea were "severe" impairments.

3. The ALJ erred in failing to address the claimant's chronic pain.

4. The ALJ erred in failing to assess whether the claimant's obesity affected her exertional limitations.

5. The ALJ erred in failing to consider the claimant's nonexertional limitations.

6. The ALJ erred in finding that the plaintiff could perform a full range of light work.

7.      The ALJ erred in disregarding the claimant's treating physicians' opinions.

In his decision of July 19, 2006, the ALJ made the following findings of fact and conclusions of law:

1.      The claimant last met the insured status requirements of the Social Security Act on March 31, 2004, and not thereafter.

2.      The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 24, 1998, through her date last insured of March 31, 2004 (20 CFR 404.1520(b) and 404.1571, *et seq*.).

3.      Through the date last insured, the claimant had the following severe impairments: fibromyalgia and obesity (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform the full range of light work.

6.      Through the date last insured, the claimant's past relevant work as a sewing machine operator did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant was not under a "disability," as defined in the Social Security Act, at any time from April 24, 1998, the alleged onset date, through March 31, 2004, the date last insured (20 CFR 404.1520(f).

The Commissioner asserts that the ALJ properly followed the five-step sequential evaluation process, finding at step one that plaintiff had not engaged in substantial gainful activity between her alleged onset date of April 24, 1998 and March 31, 2004, her date of last insured status. The Commissioner argues that, at step two, the ALJ properly found that plaintiff had the severe

4

impairments of fibromyalgia and obesity but no other severe impairments and, at step three, properly determined that plaintiff's impairments or combination of impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The Commissioner further argues that the ALJ properly determined that plaintiff's subjective complaints were not credible and that she had the residual functional capacity (RFC) to perform light work. The Commissioner maintains that, at step four, based on the vocational expert's testimony, the ALJ properly found that plaintiff's RFC allowed her to return to her past relevant work as a sewing machine operator.

Under the Act, 42 U.S.C. § 405 (g), this Court's scope of review of the Commissioner's final decision is limited to determining: (1) whether the decision of the Commissioner is supported by substantial evidence, and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson v Perales, 402 U.S. 389, 390 (1971). Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a and 416.920, 416.920a. An ALJ must consider: (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the

claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Part 404, Subpart P, Appendix 1), (4) whether the claimant has an impairment which prevents past relevant work, and (5) whether the claimant's impairments prevent her from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5), pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. §§ 404.1505(a) and 416.905(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and if proper legal standards were applied. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if she can return to her past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423 (d)(5). She must make a prima facie showing of disability by showing she is unable to return to her past relevant work. Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work

and that such work exists in the national economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. Id. at 191.

## IV. MEDICAL REPORTS

The undersigned has reviewed the medical records and finds many of the reports relevant to the issues in this case. A summary of the medical evidence as set out by the defendant in his brief is set forth herein.

*(i) Evidence Prior to The Relevant Time Period*

T. D. Williams, III, M.D., diagnosed plaintiff with "spastic colon" (also known as irritable bowel syndrome) in May 1994 after she presented to him with complaints of incomplete evacuation and cramping abdominal pain. (Tr. 387, 388). He prescribed a bulk-forming fiber laxative. (Tr. 387). Plaintiff presented to Michael K. Drakeford, M.D., with complaints of bilateral foot pain, right worse than left, in August 1995. (Tr. 104). After an injection, she reported "near 100% relief of her complaints." (Tr. 103).

Plaintiff presented to Phil Brandt, M.D., in July 1996 with complaints of right upper quadrant pain and pain radiating to her right shoulder. (Tr. 135). In May 1997, plaintiff told Dr. Brandt that she had experienced five to six weeks of morning stiffness, myalgias (muscle pain) and aching in multiple joints. (Tr. 133). The following month, she told Dr. Brandt that she continued to experience myalgia and aches "all over," although she stated that she slept "fairly well." (Tr. 132). In July 1997, after plaintiff again told Dr. Brandt that she slept poorly and experienced muscle aches, he diagnosed

her with "probable fibromyalgia," prescribed Amitriptyline,[1] and recommended that she join Weight Watchers and take a ten minute walk each afternoon. (Tr. 131). In December 1997, plaintiff reported feeling "pins and needles" in her chest, often accompanied by indigestion, but stated that her limbs ached "much less." (Tr. 131). Dr. Brandt noted that an antidepressant medication helped, but observed that "[u]nfortunately, she is very noncompliant with [her] diet." (Tr. 131).

Dr. Drakeford performed surgery on plaintiff's right shoulder in September 1997. (Tr. 94-95, 98). Several months after the surgery, plaintiff stated that her shoulder felt "strong" and "back to normal." Dr. Drakeford released her to "proceed with activities ad lib as tolerated." (Tr. 96). In January 1998, plaintiff presented to Pusadee Suchinda, M.D., and reported "less problems with stress incontinence," and no headaches, shortness of breath or nausea. (Tr. 119).

*(ii) Evidence During The Relevant Time Period*

During April 1998, plaintiff presented to Dr. Brandt with complaints of increasing muscle aches, particularly in the shoulder and thigh areas. (Tr. 130). She told Dr. Brandt that she slept poorly and that the pain was worse in the morning. (Tr. 130). Upon examination, Dr. Brandt noted that plaintiff had normal muscle tone in all four extremities, with no edema, cyanosis, clubbing or ulceration, and her reflexes were symmetrical. (Tr. 130). Dr. Brandt's impression was fibromyalgia. (Tr. 130). Dr. Brandt continued plaintiff on Amitriptyline and referred her to Ronald Collins, M.D., for evaluation of fibromyalgia. (Tr. 129, 130).

---

[1] Amitriptyline is a tricyclic antidepressant. It is used to treat symptoms of depression. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html (Last revised - 05/01/2009. MedlinePlus is a service of the U.S. National Library of Medicine and the National Institutes of Health, provided by the American Society of Health-System Pharmacists, Inc.)

Plaintiff presented to Dr. Collins in early May 1998, about ten days after she left her job at the bread store. (Tr. 151). She told Dr. Collins that she was experiencing pain in her neck, shoulder, arms, legs and ankles. (Tr. 151). She reported morning stiffness in those areas, which she said lasted about an hour. (Tr. 151). She also reported back pain, which she indicated was no worse in the morning than the evening, complained of weakness, and reported that her hair was thinning and her mouth and eyes were dry. (Tr. 151). She denied a history of incontinence, fever, chills or swelling in any of her peripheral joints. (Tr. 151). Dr. Collins' impression was myalgias of unknown etiology and shoulder pain status post right rotator cuff surgery. (Tr. 152). Plaintiff returned to Dr. Collins about two weeks later, with complaints of difficulty sleeping and "persistent generalized aching." (Tr. 150). X-rays of her sacroiliac joint (connecting the lower spine and pelvis) revealed partial fusion of the right sacroiliac joint consistent with sacroiliitis (inflammation of the sacroiliac joint); however, Dr. Collins noted that plaintiff denied significant current back pain. (Tr. 150). Dr. Collins' assessment included myalgias consistent with fibromyalgia syndrome. (Tr. 150).

In June 1998, plaintiff presented to Dr. Brandt with complaints of cough, congestion and sore throat. (Tr. 126). He diagnosed her with asthma and prescribed use of an inhaler. (Tr. 126). Dr. Brandt also wrote a letter and completed a report on plaintiff's behalf (Tr. 123-125), stating that plaintiff's impairments included asthma, obesity and fibromyalgia, and opining that "it is impossible for this patient to perform gainful employment." (Tr. 125). Dr. Brandt noted the possibility that plaintiff could enroll in a strict behavior modification program to try to help her lose weight and cope with fibromyalgia. (Tr. 125).

In both June and August 1998, Dr. Collins reported that plaintiff had multiple trigger points in her upper back. (Tr. 145-146).[2] Plaintiff continued to deny significant back pain. (Tr. 145- 146). Dr. Collins' impression was myalgias consistent with fibromyalgia, with limited response to medication. (Tr. 145-146).

Plaintiff presented to E. MacDonald Dubose, M.D., in late August 1998 for a disability examination. (Tr. 106). She reported headaches "every 1 or 2 weeks;" asthma; "irritable bowel symptoms that come and go;" pain in her back, neck, arms, legs and abdomen; diarrhea; depression; memory problems; and difficulty sleeping. (Tr. 106-107). Upon examination, Dr. Dubose noted that plaintiff was alert and in no acute distress, with a normal and appropriate affect. (Tr. 107). She had good range of motion in her shoulders and without pain. (Tr. 107). Dr. Dubose noted tenderness in Plaintiff's legs, thighs and upper and lower back. (Tr. 107). Dr. Dubose's diagnoses included "possible fibromyalgia," sleep disorder and a history of asthma, and he noted that sleep apnea and "mild" depression should be ruled out. (Tr. 107).

In October 1998, plaintiff presented to Dr. Brandt with complaints of snoring at night. (Tr. 126). Dr. Brandt referred her to Charles White, M.D. (Tr. 126). Plaintiff told Dr. White that she slept

---

[2] Tender points (sometimes called "trigger points") are specific places on the body (18 specific points at 9 bilateral locations) that are exceptionally sensitive to the touch in people with fibromyalgia upon examination by a doctor. Tender points of fibromyalgia exist at these nine bilateral muscle locations: low cervical region; (front neck area) at anterior aspect of the interspaces between the transverse processes of C5-C7; second rib (front chest area) at second costochondral junctions; occiput (back of the neck) at suboccipital muscle insertions; trapezius muscle (back shoulder area) at midpoint of the upper border; supraspinal muscle (shoulder blade area) above the medical border of the scapular spine; lateral epicondyle (elbow area) 2 cm distal to the lateral epicondyle; gluteal (rear end) at upper outer quadrant of the buttocks; greater trochanter (rear hip) posterior to the greater trochanter prominence; knee (knee area) at the medial fat pad proximal to the joint line.
http://arthritis.about.com/od/fibromyalgia/g/tenderpoints.htm?p=1 (Updated March 9, 2007. About.com is a part of The New York Times Company.) See also Stup v. Unum Life Ins. Co. Of America, 390 F.3d 301, 302-303 (4th Cir. 2004); Beahm v. Astrue, 2007 US Dist. LEXIS 53056 at *17-18 (W.D. Va. July 23, 2007).
It is noted that none of the examining physicians noted trigger points in all of these areas.

poorly and frequently awoke with dyspnea (shortness of breath) and gasping. (Tr. 385). Dr. White arranged for a sleep study (Tr. 386), which showed mild to moderate obstructive sleep disorder. (Tr. 112, 384).

During this time period, state agency physician James Woston, M.D., reviewed the medical records and determined that plaintiff could lift up to 50 pounds occasionally and 25 pounds frequently, stand and/or walk (with normal breaks) for a total of six hours in an eight-hour day, sit (with normal breaks) for a total of six hours in an eight-hour day, and had an unlimited ability to push and/or pull. (Tr. 156). Charles C. Jones, M.D., later concurred with Dr. Woston's assessment. (Tr. 162). A state agency psychological consultant also completed a Psychiatric Review Technique form, finding that plaintiff had slight restrictions in activities of daily living; slight difficulties maintaining social functioning; seldom had deficiencies in concentration, persistence or pace resulting in a failure to complete tasks in a timely manner; and never had episodes of deterioration or decompensation in work or work-like settings. (Tr. 170).

In December 1998, Dr. Collins noted trigger points in plaintiff's upper back (trapezius ridges and rhomboids) and arms (antecubital fossae).(Tr. 144). Again, plaintiff denied significant back pain. (Tr. 144). Dr. Collins' impression was myalgias consistent with fibromyalgia, with limited response to medication. (Tr. 144). In December 1998, plaintiff asserted that she had "problems" with anti-inflammatory medications, so she could not take them for relief. (Tr. 85).

Dr. Brandt provided another letter and report for plaintiff in April 1999. (Tr. 120-122). He stated that plaintiff had fibromyalgia and sleep apnea, noted the possibility of a psychiatric referral, and stated that her long-term outlook was "relatively poor for being able to perform gainful

employment." (Tr. 120). Dr. Brandt noted Dr. Collins' opinion that plaintiff needed to increase her exercise program. (Tr. 120).

Plaintiff did not return to Dr. Collins until October 1999. (Tr. 178). She complained of "terrible" headaches over the past 10 weeks, and reported an aching pain in her neck prior to the onset of the headaches. (Tr. 178). She stated that she was not sleeping through the night. (Tr. 178). Upon examination, Dr. Collins noted trigger points only at the back of Plaintiff's neck. (Tr. 178). His impression was "myalgias consistent with fibromyalgia syndrome," but he now found that the myalgias were "apparently responsive to doxepin HCl.[3]"(Tr. 178). Dr. Collins again noted that plaintiff denied significant current back pain, although radiographic changes at the right SI joint were consistent with sacroiliitis. (Tr. 178). The following month, plaintiff complained to Dr. Brandt about pain in the base of her neck. (Tr. 175). She told Dr. Brandt that she was unable to afford a sleep test. He prescribed Doxepin, Prevacid, Wygesic, Gaviscon and recommended she try to lose weight. (Tr. 175).

During the same time period, plaintiff returned to Dr. White, stating that she had not returned for a follow-up of the sleep study because she thought she was doing better with medication. (Tr. 383). Plaintiff reported that she was still waking up during the night and having problems with "sleep hygiene." (Tr. 383). Dr. White reviewed the results of the sleep study with plaintiff. (Tr. 383). Plaintiff stated that she would be losing her insurance, and declined further sleep studies. (Tr. 383). She stated that she would try to lose weight through exercise and diet. (Tr. 383).

In January 2000, plaintiff presented to Dr. Collins with complaints of easy fatigability, lower back pain, recent swelling in her hands (although her hands were not swollen at the time of the

---

[3] Doxepin is used to treat depression and anxiety. Doxepin is a tricyclic antidepressant. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682390.html (Last reviewed - 02/01/2009.)

examination), and stiffness in her right shoulder, especially early in the morning. (Tr. 177). Upon examination, Dr. Collins observed a positive impingement sign at plaintiff's right shoulder. (Tr. 177). Dr. Collins again noted that plaintiff had low back pain consistent with sacroiliitis in the right SI joint although she denied significant back pain currently. (Tr. 177). Plaintiff had full 5/5 muscle strength in her arms and legs. (Tr. 177). Again, his impression was "myalgias consistent with fibromyalgia syndrome," and he again noted that the myalgias were apparently responsive to doxepin HCl. (Tr. 177).

Also in January 2000, plaintiff presented to Dan H. Allen, Ph.D., for a psychological evaluation. (Tr. 172-174). She stated that she "never" slept an entire night, did very little cooking (instead eating food that her husband brought home or going out to eat with her husband), and only drove to the grocery store or to pay bills. (Tr. 172-173). She stated that she found it hard to be around other people, but acknowledged speaking with a friend occasionally and attending church. (Tr. 173). Upon examination, Dr. Allen observed that plaintiff was alert and oriented, with coherent thought content and no evidence of thought disorganization. (Tr. 173). Dr. Allen administered the Weschsler Adult Intelligence Scale-III; plaintiff's full score of 79 placed her in the high borderline/low average range of intellectual functioning, with a verbal score of 80 and a performance score of 83. (Tr. 173). Dr. Allen found no evidence of significant impairment in short-term auditory memory, attention or concentration. He noted that plaintiff's computation and vocabulary scores were adequate based on the results of the WRAT-3 test, on which her performance was equivalent to a 6th, 7th, and 8th grade level in arithmetic, reading and spelling, respectively. (Tr. 173). Dr. Allen's impression was that plaintiff was experiencing a "depressed mood;" however, he noted that she was "well able to follow simple instructions" and her short term memory and concentration were intact. (Tr. 174).

Plaintiff returned to Dr. Williams in February 2000 with complaints of frequent stools (averaging two to three per day) with incomplete evacuation. (Tr. 382). Dr. Williams performed an upper endoscopy, which revealed a normal esophagus and stomach, and prescribed Metamucil. (Tr. 358-361, 382). In June 2000, plaintiff returned to Dr. Williams and reported improvement in her bowel habits, evacuation and bloating, but she did complain of nausea and fullness as well as pain in the right upper quadrant of her abdomen. (Tr. 382). Dr. Williams decreased her Metamucil. (Tr. 382). About two months later, plaintiff reported that she was doing "a little bit better," but complained of pain, diarrhea and incomplete evacuation. (Tr. 381). A September 2000 colonoscopy revealed functional diarrhea, but was negative for colitis. (Tr. 355, 357, 380). Plaintiff increased her Metamucil and reported that she was "better" and that her cramps had improved with medication. (Tr. 380).

Plaintiff began treatment at the Santee Wateree Mental Health Clinic in April 2000. (Tr. 422-425, 436). During her initial visit, she reported depression related to her impairments, anxiety around other people, low energy and poor sleep. (Tr. 436). Plaintiff's clinical assessment form indicates that she could perform clerical work (Tr. 423), that her motor activity was not impaired and that her memory was fair, although her concentration was poor. (Tr. 424). In June 2000, she reported that her sleep improved after she began taking Tylenol P.M. (Tr. 434). In August 2000, she told David A. Justice, M.D., that she was doing "well" after he increased her antidepressant medication, and she denied any active mood symptoms. (Tr. 433). Two months later, she reported that she was struggling with memories of childhood abuse, and Dr. Justice referred her to a counselor. (Tr. 432). When plaintiff returned to Dr. Justice the following month, he noted "mild anxiety" but observed that her affect was appropriate with a normal range, her thought process was logical, sequential and goal-

directed, her abstraction and concentration were intact, her memory was intact in all spheres, and she had a normal gait and made good eye contact. (Tr. 429). Plaintiff told social worker Elizabeth A. McIntosh that, with medication, she answered the phone and left her room more often. (Tr. 432). Ms. McIntosh noted that plaintiff was not following her doctors' suggestion that she walk for 10 minutes each day. (Tr. 432).

During November 2000, plaintiff presented to Dr. Brandt with complaints of cough, congestion, and sore throat. (Tr. 441). Dr. Brandt diagnosed her with an upper respiratory tract infection. (Tr. 441). In February 2001, plaintiff presented to Dr. Justice with complaints of dysphoria and poor sleep. (Tr. 429). Dr. Justice noted that plaintiff declined further counseling. (Tr. 429). The following month, plaintiff presented to Dr. Brandt with complaints of chest pain (which did not radiate to her arms or neck) and exhaustion. (Tr. 440). Dr. Brandt noted "nutrition excessive" and moderate anxiety. (Tr. 440). Dr. Brandt referred her to Mitchell W. Jacocks, M.D. (Tr. 440, 378-379). Plaintiff told Dr. Jacocks that for the past six to eight weeks she had experienced chest discomfort two or three times a week for 12 hours at a time. (Tr. 377). Dr. Jackocks performed a Bruce protocol exercise stress test. (Tr. 395, 441). Plaintiff exercised for about six and a half minutes during the stress test; the test results were negative for coronary disease. (Tr. 395).

Plaintiff returned to Dr. Brandt in May 2001 with complaints of episodic choking, usually occurring while she was at rest. (Tr. 440). Upon examination, Dr. Brandt again noted excessive nutrition and moderate anxiety. (Tr. 440). Dr. Brandt stated, "hopefully she can walk more and lose weight." (Tr. 440). Also during May 2001, plaintiff returned to Dr. Justice with complaints of "sad mood," crying spells and "some anxiety." (Tr. 428). Dr. Justice noted that plaintiff had not consistently followed up with counseling and had declined his recommendation of counseling, citing

financial concerns. (Tr. 428). Again, although Dr. Justice noted "moderate anxiety," plaintiff had a logical, sequential and goal-directed thought process; relevant thought content; intact memory, abstraction and concentration; walked with a normal gait; and made good eye contact. (Tr. 428). Dr. Justice increased plaintiff's antidepressant. (Tr. 428). About two months later, plaintiff told Dr. Justice that she was "all right just having some personal problems." (Tr. 426). She noted an improvement in her mood, and requested a referral back to counseling. (Tr. 426). Again, plaintiff had a logical, sequential and goal-directed thought process; relevant thought content; intact memory, abstraction and concentration; walked with a normal gait; and made good eye contact. (Tr. 426).

During October 2001, plaintiff presented to Dr. White "for the first time in several years," and reported increasing nonrestorative sleep, snoring, coughing, asthmatic symptoms, headaches and difficulty driving due to sleepiness. (Tr. 375). Dr. White noted that plaintiff had gained weight since her last visit and had not started an exercise program. (Tr. 375). Plaintiff denied diarrhea, constipation, increased frequency or urgency, joint pain and arthralgias. (Tr. 375). Dr. White prescribed Pulmocort, Serevent and trial of nasal continuous positive airway pressure, using a CPAP machine. Plaintiff told Dr. White that she wanted to buy a used CPAP machine because she could not afford to undergo a repeat sleep study, having lost all of her insurance. (Tr. 376). Also during October 2001, plaintiff presented to Dr. Brandt with complaints of burning in her arms and legs, which she stated had been present for the past two or three months, and occasional headaches. (Tr. 439). Dr. Brandt's impression was "parasthesias in upper and lower extremities cause undetermined, pernicious anemia to be ruled out" and his plan included continued studies for sleep. (Tr. 439).

Plaintiff returned to Dr. White the following month. (Tr. 373). She told him that she had been using a CPAP machine and overall had been doing better, although she still had some daytime

sleepiness. (Tr. 373). Plaintiff reported that she sometimes pulled off the CPAP face mask at night and snored; Dr. White noted that her husband did not get her to replace the mask. (Tr. 373). Plaintiff denied choking episodes, wheezing, cough, shortness of breath, and chest pains. (Tr. 373). She stated that her asthma symptoms had improved, and Dr. White noted that her exercise tolerance might have improved, as well. (Tr. 373). Again, plaintiff denied diarrhea, constipation or increased frequency or urgency, and her abdomen was not tender. (Tr. 373).

Plaintiff did not return to Dr. Brandt until May 2002, when she presented with complaints of depression and lower back pain. (Tr. 438). Dr. Brandt noted that plaintiff was no longer taking antidepressants, could not afford care at the mental health clinic, and was not taking medication for her back pain. (Tr. 438). Upon examination, he noted tenderness in her lumbosacral (lower) spine, "excessive" nutrition, and "high" anxiety. (Tr. 438). Dr. Brandt prescribed a narcotic pain reliever and an antidepressant. (Tr. 438).

Plaintiff presented to advance practice registered nurse Leslie Justice of the Santee-Wateree Mental Health Center for an initial assessment during September 2003. (Tr. 411-414). Ms. Justice noted that plaintiff's symptoms returned after she stopped taking her medication. (Tr. 412). Plaintiff stated that she went to church but was not well-connected. (Tr. 413). Ms. Justice noted that plaintiff's motor activity was "normal." (Tr. 413). She provided plaintiff with samples of an antidepressant. (Tr. 412). During a follow-up appointment, William A. King, M.D., noted that plaintiff had been on an antidepressant for a little over two weeks, and should continue on the medication for at least another month. (Tr. 411). Her GAF score was 60. (Tr. 412). The clinical assessment note indicated that she had lost forty pounds in seven months. (Tr. 414). Plaintiff subsequently missed two follow-up appointments at the clinic. (Tr. 407-408).

Plaintiff presented to Dr. Brandt in October 2003, with reports of choking sensations and episodic wheezing. (Tr. 438). Dr. Brandt noted that she did not have dysphagia (difficulty swallowing), and that he did not observe any wheezing, but that plaintiff's anxiety level was "high." (Tr. 438). Plaintiff reported that she attended church and received mental health treatment. (Tr. 438). Plaintiff returned to the Santee-Wateree Mental Health Center in November 2003, stating that she had received antidepressant samples from her family doctor, but that she had run out. (Tr. 407). She reported feeling panicky at times, and stated that she had been staying home and not leaving the house for days at a time. (Tr. 407). Dr. King advised her to increase the dose of her antidepressant. (Tr. 407). The following month, she stated that she was "feeling better" on her present medication, that it had "finally begun to work," and that she was "less depressed." (Tr. 406). Dr. King noted that her mood and affect were appropriate, and her speech was clear, coherent, and relevant. Her GAF score was 90. (Tr. 406).

During early 2004, Plaintiff presented to Dr. Brandt with complaints that she had been coughing and wheezing for the past three or four days, and that her symptoms had not been relieved by over-the-counter remedies or increased use of her inhaler. (Tr. 352). She reported low-grade fevers and chills, but denied diarrhea, abdominal pain, or nausea. (Tr. 352). Dr. Brandt diagnosed her with bronchitis and asthma, with acute exacerbation, and prescribed an antibiotic. (Tr. 352).

During early March 2004, plaintiff told Dr. King that she had been staying home most of the time the past three months and feeling depressed. (Tr. 405). She stated that, when she did go out, she went to the store and overspent, angering her husband. (Tr. 405). Dr. King decided to increase plaintiff's medication after she stated that she was not experiencing any side effects. (Tr. 405).

During that same time period, Gilbert E. Parker Jr., M.D., administered a double-contrast barium enema, which showed diverticular disease throughout plaintiff's colon. (Tr. 392).

*(iii) Evidence After The Relevant Time Period*

After plaintiff's March 31, 2004, date last insured, she returned to Dr. White for the first time since November 2001, for treatment of asthmatic bronchitis and obstructive sleep apnea/hypopnea syndrome. (Tr. 393-372). During her April 2004 visit, she told Dr. White that she slept "fairly well" and felt "refreshed' in the mornings. (Tr. 371). Plaintiff further stated that, while she had "[s]ome increased daytime sleepiness at times," she had "no significant problem" with driving. (Tr. 371). During that visit and subsequent visits to Dr. White, plaintiff denied diarrhea, constipation, or increased frequency or urgency. (Tr. 363, 366, 371, 443, 445). Plaintiff also continued to receive treatment at the Santee-Wateree Mental Health Center (Tr. 397-404) and from Dr. Brandt. (Tr. 350-351, 437).

An April 2004 chest x-ray showed no definite acute cardiopulmonary abnormality. (Tr. 391). Dr. Jacocks examined plaintiff in January 2006, finding no evidence of any significant ischemia, normal left ventrical function and low probability of occlusive coronary disease. (Tr. 393-394). During May 2006, Dr. White completed a questionnaire from plaintiff's counsel, indicating plaintiff's diagnoses, symptoms, and his opinions regarding her limitations. (Tr. 447-449). Neither the questionnaire nor Dr. White's response indicated whether the information related back to the period prior to March 31, 2004, plaintiff's last insured date. (Tr. 447-449). Also during May 2006, Dr. Brandt provided a letter summarizing his treatment of plaintiff. (Tr. 450-451). Dr. Brandt opined that plaintiff's impairments, in combination, affected her ability to work on a daily basis. (Tr. 451). In particular, he opined that chronic pain from her fibromyalgia, fatigue, decrease in concentration and

memory, as well as low energy resulting from her conditions, would affect her ability to get up and go to work at a specific time, be productive at work, and complete her work on a timely manner. (Tr. 451). Dr. Brandt further opined that plaintiff "would be likely to need multiple rest/lying down periods during the day," and would miss more than three days of work per month. (Tr. 451). Dr. Brandt also opined that plaintiff had environmental limitations that would restrict her ability to be around irritants to her respiratory system, including perfume, tobacco, dust, and cleaning products. (Tr. 451). Dr. Brandt stated that his opinion had not changed since he provided a letter on plaintiff's behalf during 1999, and that she "was not able to engage in gainful employment due to the multiple medical problems." (Tr. 451).

## V. PLAINTIFF'S SPECIFIC ARGUMENTS

**The ALJ erred in failing to adequately consider and explain the combined effect of plaintiff's multiple impairments.**

Plaintiff argues that "[t]he ALJ found that...the fibromyalgia and obesity were the only severe impairments and dismissed the assertions of arthritis, asthma, sleep apnea, depression and anxiety as being "not severe." (Pl. Br. at 29). Plaintiff argues that "the ALJ failed to address any limitations or impairments resulting from the obesity" (Pl. Br. at 30) and asserts that her "extreme obesity combined with the asthma, sleep apnea and depression would worsen the functional limitations imposed by these medical impairments." (Pl. Br. at 31). Plaintiff argues that "the ALJ utterly failed to consider any of the physical or mental limitations imposed upon [her] by her multiple medical problems." (Pl. Br. at 35). Plaintiff argues that "the ALJ failed to consider a number of factors in the evaluation of [her] RFC," i.e. fatigue; chronic pain; impaired attention and concentration; environmental restrictions related to asthma; and non-exertional limitations related to depression. (Pl. Br. at 37). Plaintiff essentially asserts that, in determining the severity of her impairments at step two and assessing her

RFC at step four of the sequential evaluation process, the ALJ erred by considering only her fibromyalgia and her obesity. Plaintiff argues that the ALJ failed to consider any of her non-severe physical impairments (sleep apnea, arthritis of the SI joint, shoulder, knees and feet) or her mental impairment (depression) *in combination with* her severe impairments. (Pl. Br. at 37).

The Commissioner argues that the ALJ did not end his analysis at step two, but that he continued with the sequential evaluation process and considered *all* of plaintiff's medically determinable impairments, both severe and non-severe, during the remaining steps of the analysis. (Def. Br. at 20). The Commissioner asserts that the ALJ specifically concluded "after careful consideration of all of the evidence" that plaintiff was not disabled, stating that his RFC assessment was based on his consideration of "all symptoms." (Def. Br. at 21). The Commissioner argues that the ALJ explicitly discussed plaintiff's asthma, arthritis, sleep apnea, depression, and anxiety in assessing her RFC. Thus, the Commissioner argues, even if the ALJ erred in failing to find that those impairments were severe (which the Commissioner does not concede), it would be harmless error because the ALJ considered all of those impairments during the later steps of his disability determination. (Def. Br. at 22).

The Commissioner argues that, contrary to plaintiff's assertion that the ALJ failed to consider her impairments "as a whole," the record shows that the ALJ considered the effect of her combined impairments. In support of this assertion, the Commissioner cites the portions of the ALJ's decision at Tr. 241, stating that he considered "the combined effect of her impairments on her ability to work," and at Tr. 244, stating that "even considered in combination, [these impairments] do not restrict the claimant's ability to sustain performance of basic work activities." (Def. Br. at 22). Finally, the Commissioner argues that the ALJ specifically discussed plaintiff's obesity, noting that her

impairments (including obesity) might limit strenuous physical exertion and heavy lifting and carrying, but that she demonstrated good strength, normal gait without the need for an assistive device, and fairly good flexibility." (Def. Br. at 23).

The ALJ found that plaintiff's fibromyalgia and obesity were severe impairments. The ALJ further found that plaintiff's fibromyalgia was aggravated by her obesity:

> The evidence does not show that the claimant has undergone treatment such as ongoing, repeated trigger point injections or physical therapy as is generally prescribed as treatment for fibromyalgia. Nevertheless, the evidence indicates that the claimant's fibromyalgia is aggravated by her obesity and causes some limitations in strenuous physical exertion. She is 5'4" tall with weight during the period in question ranging from approximately 240 to 270 pounds. According to her testimony at the supplemental hearing, she currently weighs 303 pounds.

(Tr. 242).

> In view of her myalgias which were noted to be consistent with fibromyaglia, and her morbid obesity, the claimant's resulting symptoms may limit strenuous physical exertion and heavy lifting and carrying. However, she shows good strength, intact neurological functioning, no signs of active synovitis, normal gait without need for an assistive device, and fairly good flexibility. her primary care physician, Dr. Brandt, has repeatedly advised the claimant to walk and has indicated no adverse consequences of walking (Exhibits 8F, page 12 and 21F, page 4: and [t]estimony from the claimant at supplemental hearing). Based on the overall evidence, I find that the claimant retains the ability to lift and carry at least 20 pounds occasionally and 10 pounds frequently, stand and walk throughout the workday, and sustain performance of light exertion as defined in the Social Security Act and Regulations.

(Tr. 243).

After making the above-noted determination of plaintiff's residual functional capacity (RFC), the ALJ's decision goes on to discuss, separately and individually, her other allegedly disabling impairments, finding that "The claimant has alleged several other impairments. However, review of

22

the evidence fails to demonstrate that any other impairment constitutes a "severe" impairment within the meaning of the Social Security Act and Regulations." (Tr. 243).

At the conclusion of this portion of his decision, the ALJ summarizes his step two assessment:

> Review of the evidence shows that the claimant's obstructive pulmonary disease is mild with no significant limitations in moving air in and out of her lungs and no significant or frequent exacerbations of her respiratory status. Her hypertension is well controlled with no evidence of underlying significant cardiac disease. While she may have irritable bowel syndrome, she has been gradually gaining weigh with no evidence of anemia, anorexia, need for acute treatment, or signs of underlying infection. her sleep apnea is well controlled with use of a CPAP machine. None of those impairments causes significant limitation of function and they cannot be considered "severe" within the meaning of the Social Security Act and Regulations. Even considered in combination, they do not restrict the claimant's ability to sustain performance of basic work activities.

(Tr. 244).

While the ALJ's last sentence in the above paragraph states that he considered the combined effect of the above-listed, non-severe impairments with each other, his finding provides no indication that he considered the *combined effect* of these *non-severe* physical impairments *together with* the plaintiff's *severe* physical impairments of fibromyalgia and obesity. Nor does the ALJ's decision discuss or explain whether he gave any consideration to the combined impact of plaintiff's physical and mental impairments. The ALJ's failure to adequately consider the combined effect of plaintiff's multiple impairments violates 20 C.F.R. § 404.1523, which requires that:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do

not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520)."

The ALJ's Finding 4. is "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (Tr. 240). In the boilerplate introduction to his discussion of his RFC finding (Finding 5.) that plaintiff could perform a full range of light work during the relevant time period prior to her date last insured, the ALJ states that he "considered the combined effect of her impairments on her ability to work. Reichenbach v. Heckler, 808 F.2d 309 (4th Cir. 1985)." (Tr. 241). However, despite these conclusory findings and the citation to Reichenbach, the ALJ's discussion of plaintiff's impairments is fragmentized and his decision fails to meet the Fourth Circuit's standard for analyzing and explaining the combined impact of all of a claimant's impairments on her ability to do work, as enunciated in Reichenbach, Hines v. Bowen, 872 F.2d 56 (4th Cir. 1989), and Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989).

In Walker, the Fourth Circuit held that:

> It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity. In recognizing this principle, this Court has on numerous occasions held that in evaluating the effect of various impairments upon a disability benefit claimant, the Secretary must consider the combined effect of a claimant's impairments and not fragmentize them. Reichenbach v. Heckler, 808 F.2d 309 (4th Cir. 1985); DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983); Oppenheim v. Finch, 495 F.2d 396 (4th Cir. 1974); Hicks v. Gardner, 393 F.2d 299 (4th Cir. 1968); Griggs v. Schweiker, 545 F.Supp. 475 (S.D.W.Va. 1982). As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments. Reichenbach, 808 F.2d at 312. In this case, the ALJ did

not comply with these requirements and the claimant is entitled to have
his claim remanded for proper consideration.

Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)

In the paragraph following the ALJ's discussion of plaintiff's COPD, hypertension, irritable bowel syndrome, and sleep apnea, the ALJ addresses plaintiff's history of mild rosacea, resection of her axillae for sweat gland removal, and hysterectomy. He notes that she was not diagnosed with diabetes until August 2004 and that "there is no evidence of complications from diabetes during the period before expiration of her insured status." (Tr. 244).

In the next paragraph, the ALJ goes on to address plaintiff's alleg[ed] mental problems as a source of disability." (Tr. 244). After almost two pages of a separate discussion of plaintiff's anxiety and depression, the ALJ concludes that "the claimant does not have a "severe" mental or emotional impairment." (Tr. 246). Again, however, the ALJ's evaluation of plaintiff's functional mental limitations is treated completely separately and distinctly from his evaluation of her physical impairments. There is no consideration and explanation of the combined effect of plaintiff's physical and mental impairments here, or in any other portion of the ALJ's decision. The only point in the ALJ's decision in which the combined impact of all of plaintiff's physical and mental impairments (together with her alleged exertional and non-exertional limitations) is mentioned is in the context of the ALJ's conclusory finding that "no weight" should be accorded to Dr. Brandt's May 2006 opinion that "the claimant continued to have fibromyalgia, asthma, sleep apnea, depression, obesity, and anxiety that *in combination* greatly affect her ability to even complete the normal activities of daily living and which would affect her ability to work on a regular basis (Exhibit 24F)." (Tr. 248) (emphasis added).

After determining that plaintiff has no severe mental or emotional impairments, the ALJ's discussion immediately returns to his analysis of plaintiff's credibility and sets forth the basis for his earlier finding that plaintiff's subjective allegations "are not substantiated by the total record and not credible." (Tr. 241). In this portion of his decision, the ALJ summarily reviews the diagnostic and clinical medical evidence, recounts plaintiff's testimony, discounts the opinions of her treating physicians and her psychiatrist, and concludes with the statement: "I have considered the entire record including clinical findings, results of diagnostic studies, medical opinions, the claimant's subjective allegations, and the combined effect of all of the claimant's impairments and find that the residual functional capacity as set forth above is an accurate reflection of the claimant's residual functional capacity during the period in question." (Tr. 249).

In Saxon v. Astrue, 2009 U.S. Dist. LEXIS 85250 (D.S.C. Sept. 14, 2009), this Court recently considered this same issue. Judge Blatt's opinion in Saxon provides an excellent summary of the controlling law which establishes the correct legal standard for an ALJ's consideration and explanation of the combined effects of a claimant's multiple impairments. Saxon offers a forceful, practical example of the correct application of that law and its holding is entirely relevant to this Court's review of the ALJ's decision in the instant case:

> In Walker, the Fourth Circuit Court of Appeals remanded the plaintiff's claim because the ALJ failed to adequately consider and explain his evaluation of the combined effects of the impairments. Walker, 889 F.2d at 49-50. There, the ALJ found that the plaintiff suffered from several ailments and noted the effect of each impairment separately. The ALJ concluded that "the claimant did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Reg. No. 4." Id at 49. The Fourth Circuit rejected this conclusion as inadequate because the ALJ neither analyzed nor explained his evaluation of the cumulative effect of claimant's impairments. Id at 49-50. As the court noted, "Congress explicitly requires that 'the combined effect of all the individual's

impairments' be considered, 'without regard to whether such impairment if considered separately' would be sufficiently severe." Id. (quoting 42 U.S.C. § 423(d)(2)(C) and Hines v. Bowen, 872 F.2d 56, 59 (4th Cir. 1989). In addition to *considering* the combined effect, the court noted that "the ALJ must adequately *explain* his or her evaluation of the combined effects of the impairments." Id. (citing Reichenbach v. Heckler, 808 F.2d 309 (4th Cir. 1985))(emphasis added).

More recently, judges in the District of South Carolina have reiterated the importance of the ALJ providing an adequate explanation of the evaluation of the combined effects of the impairments. For example, in Lemacks v. Astrue, Judge Harwell adopted the Magistrate Judge's R&R, stating as follows:

> While the ALJ proceeded to thoroughly discuss each of the plaintiff's severe impairments, in this case, he "simply noted the effect or noneffect of each and found that the claimant could perform light...work." Walker, 889 F.2d at 50 (R. at 16-17.) Specifically, the ALJ progressed through each severe impairment individually, treating each in separate paragraphs, examining relevant evidence and ascribing functional limitations reasonably produced. Id. At no point does the ALJ make any conclusion about the corporate or compounding effect these impairments might have on the plaintiff's functional limitations, viewed together. The court in Walker, faced with the exact same treatment by the ALJ, found such treatment "fragmentize[d]" and remanded the case for "proper consideration." Walker, 889 F.2d at 50.

> The Court is aware that the structure of the ALJ's analysis in this case is not uncommon. Most decisions reviewed by the Court profess to consider the combined effects of claimant's impairments, while actually analyzing each impairment separately. The ALJs may, in fact, be considering the combined effect, but analysis reflecting such consideration is seldom included. Walker requires adequate explanation and evaluation, see id.; in its absence, judicial review cannot be had. These decisions commit precisely the error rejected in Walker, and when a claimant brings them to the attention of the Court, they cannot be ignored. As recently as this year, this district has reaffirmed its

commitment to enforcing the requirements of <u>Walker</u> that the ALJ make express his treatment of the combined effects of all impairments. <u>See</u> <u>Alonzeau v. Astrue</u>, 2008 U.S. Dist. LEXIS 7749, 2008 WL 313786, at *3 (D.S.C. Feb. 1, 2008).[4]

<u>Lemack v. Astrue</u>, 2008 U.S. Dist. LEXIS 110165, 2008 WL 2510087 at *4 (D.S.C. May 29, 2008) (unpublished). Likewise, in <u>Alonzeau</u>, Judge Seymour adopted the R&R, finding that the ALJ failed to adequately explain his evaluation of the combined effects of the plaintiff's impairments. 2008 U.S. Dist. LEXIS 7749, 2008 WL 313786 at *3. The court noted: "Even if one could infer that the ALJ considered the effect of obesity combined with Plaintiff's other impairments or the cumulative effect of all of Plaintiff's impairments from the ALJ's listing of various medical observations in his analysis of the Plaintiff's RFC, the ALJ failed to adequately explain his evaluation of any cumulative effects." <u>Id</u>.

Here, the ALJ summarily stated that the "claimant does not have an impairment *or combination of impairments* that meets or medically equals one of the listed impairments...." Then, the ALJ considered the effect of the impairments individually. (Tr. at 17 (emphasis added)). What is missing from the ALJ's findings, however, is an *explanation* of his evaluation of the combined effect of the Plaintiff's impairments. And although it is possible to infer from the ALJ's review of the medical evidence and his RFC evaluation that he did in fact consider the combined effect of the Plaintiff's impairments (as demonstrated by the Magistrate Judge in the R&R), the Court finds that such an *inference* falls short of the required evaluation. Rather, as the Fourth Circuit has instructed, "the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." <u>Walker</u>, 889 F.2d at 50. Here, because the ALJ did not adequately explain his evaluation of the combined effects, the appropriate judicial review cannot be had and the Court cannot say whether substantial evidence supports the Commissioner's decision. Therefore, the Court finds that the Plaintiff is entitled to have his claim remanded for proper consideration."

<u>Saxon v. Astrue</u>, 2009 U.S. Dist. LEXIS 85250 at *21-25 (D.S.C. September 14, 2009).

---

[4] <u>See</u> <u>also</u> <u>Washington v. Astrue</u>, 2009 U.S. Dist. LEXIS 86173 (D.S.C. Sept. 21, 2009)(reversing and remanding the ALJ's decision because he failed to properly consider the combined effect of plaintiff's impairments).

In the instant case, as in <u>Saxon</u>, <u>Lemack</u>, and <u>Washington</u>, the ALJ professes to have considered, at step three, whether the combination of plaintiff's impairments met or medically equaled a listing in the grids. At step four, the ALJ also professes to have considered all of plaintiff's impairments in assessing her RFC. However, the ALJ's decision discusses plaintiff's physical impairments separately from plaintiff's mental impairment and never considers and explains the impact of both types of impairments, together, on plaintiff's ability to perform work. Furthermore, the ALJ's RFC assessment discusses plaintiff's severe physical impairments together (i.e. the aggravating effect of plaintiff's severe obesity on her severe fibromyalgia), but never considers and explains the combined effect of plaintiff's non-severe physical impairments and her non-severe mental impairments, together with her severe physical impairments.

The undersigned is cognizant of the age of this claim and that it has been remanded once before. Nonetheless, we are to determine whether the Commissioner's decision is supported by substantial evidence. The ALJ failed to properly discuss the combined effects of plaintiff's impairments. This case is remanded for proper consideration and discussion of the combined effects and/or any additional analysis and testimony the Commissioner deems necessary. This court is unable to complete its function on the record presented. Consequently, the undersigned must recommend that this case, once again, be reversed and remanded to the Commissioner for proper consideration as outlined above.

## VI.  CONCLUSION

Accordingly, pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of Section 205(g) of the Social Security Act, 42 U.S.C. § 405 (g), it is

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further administrative action as set out above.

Respectfully submitted,


s/Thomas E. Rogers, III
February 10, 2010                                    Thomas E. Rogers, III
Florence, South Carolina                      United States Magistrate Judge